|  |  |
|---|---|
| MULTIMEDIA COMMERCE GROUP, INC.<br>and AMERICA'S COLLECTIBLES<br>NETWORK, INC. d/b/a Jewelry Television®,<br><br>Plaintiff,<br><br>v.<br><br>POSH TV, A Joint Venture;<br>ZALEMARK HOLDING COMPANY, INC.;<br>DAVID STILES; STILES FAMILY LIMITED<br>PARTNERSHIP; and HARRY KABADAIAN,<br><br>Defendants. | Case No. 3:11-CV-00470<br><br>Hon. Pamela L. Reeves |

## MEMORANDUM IN SUPPORT OF MOTION
### (1) FOR SUMMARY JUDGMENT ON PLAINTIFF'S AMENDED COMPLAINT; AND
### (2) FOR PARTIAL SUMMARY ADJUDICATION DISMISSING COUNTS I, II, IV AND VI OF PLAINTIFF'S AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 56, Defendant Zalemark Holding Company,

Inc., a Delaware corporation, ("Zalemark") respectfully requests that the Court grant its Motion

for Summary Judgment, or in the Alternative, Summary Adjudication. This Motion is made on

the grounds that there is no relevant triable issue of material fact with respect to Plaintiff's claims

for unfair competition, unlawful use of a counterfeit mark, common law trademark infringement,

and unjust enrichment, and that, with respect to Defendant Zalemark, Plaintiff's claims in the

First Amended Verified Complaint (the "Amended Complaint," or "AC") (Dkt. No. 40) filed by

Plaintiffs America's Collectibles Network, Inc. d/b/a Jewelry Television ("JTV") and

Multimedia Commerce Group, Inc. ("MCGI") (collectively, "Plaintiffs") are in whole or in part

without merit. Specifically:

1

A. Plaintiff's Amended Complaint should be dismissed in its entirety as to Zalemark because Zalemark was merely a service contractor and a minority shareholder in Luxury Ventures, and was therefore had no liability as a joint venturer for any wrongful conduct of Posh TV or any of the other defendants.

B. Plaintiff's Amended Complaint should be dismissed in its entirety, as Defendants' use of the trademarks constituted fair use.

C. In the alternative, Count I of Plaintiff's Amended Complaint for Unfair Competition should be dismissed for the following reasons:

    a. Defendants never engaged in conduct which "passed off" its products as those of Plaintiff.

    b. Defendants never intended to deceive the public as to the source of its products and services.

    c. Plaintiff produced no evidence that the public was <u>actually</u> confused as to the source of Posh TV's products and services.

D. Count II of Plaintiff's Amended Complaint for Unlawful Use of a Counterfeit Mark fails for the following reasons:

    a. Defendants' uses of trademarks at issue were in a context that clearly identified the true source: Posh TV.

    b. The marks were neither "spurious," nor "substantially indistinguishable."

    c. GEMSTV Mark is Not Registered on the Principal Register for Online or Television-Related Retail Services.

E. Additionally, Count IV of Plaintiff's Amended Complaint for Common Law Trademark Infringement is without merit because there was no likelihood of

confusion in the marketplace, and, specifically as to GEMSTV, the mark was not used in the marketplace by Plaintiff.

F. Finally, Count VI of the Amended Complaint for Unjust Enrichment fails because no evidence was presented by Plaintiff that Defendants made any profits or acquired any other benefit in connection with their use of the allegedly infringing marks.

## MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT OR, IN ALTERNATIVE, SUMMARY ADJUDICATION

### I. INTRODUCTION

#### A. Relevant Parties

Plaintiff JTV is a retailer that sells jewelry and gemstones through television broadcasts and over the internet. *See* AC ¶ 2. As described further below, JTV is the owner of the registered trademark for JEWELRY TELEVISION. *See id.* Plaintiff MCGI is JTV's parent company. *See id.* In 2010, following the bankruptcy of GemsTV USA, MCGI acquired the registered trademark for GEMSTV. *See id.*

Former Defendant David Stiles is an engineer, inventor, and entrepreneur who has co-founded and served in executive roles at several successful technology companies. Mr. Stiles was the former president of former-defendant Luxury Ventures, LLC ("Luxury Ventures"), an entity that, during 2010 and 2011, operated and provided retail jewelry sales through the "Posh TV" television channel and its related website, www.poshtv.com, before filing for bankruptcy in 2011. *See* AC ¶¶ 12, 23-25. In November 2011, Luxury Ventures filed for bankruptcy. *See* Suggestion of Bankruptcy (Dkt. No. 23). That bankruptcy proceeding is complete, and according to Plaintiffs, Luxury Ventures is "no longer a party" in this case. *See* Dkt. No. 64, at 2

3

n.1. On June 6, 2014 Defendant Stiles was dismissed from this case pursuant to the Court's grant of a Motion for Approval of Good Faith Settlement (Dkt. No. 92).

Defendant Zalemark is an award winning product design and product development agency. On September 17, 2010, Zalemark entered into a Marketing Services Agreement with Luxury Ventures for performance of certain marketing and development services in connection with the Posh TV project. *See* Declaration of David Stiles ("Stiles Decl.") ¶ 4, Ex. C. Defendant Posh TV was a jewelry television business operated by Luxury Ventures, and not a legal entity separate from Luxury Ventures. *See* Stiles Decl. ¶ 4. The AC alleges that "Defendant Posh TV is a joint venture composed of Defendant Zalemark and Defendant Luxury Ventures," and that Zalemark is "liable as a co-venturer with Defendant LV for the wrongful conduct of Posh TV." *See* AC ¶¶. 4, 10, 11, 21, & 26. In support of their joint venture argument, Plaintiffs cite the following conduct by Defendants:

a.  Statements made by Zalemark in the January Shareholder Letter. *See* AC ¶ 26, Ex. B.

b.  Statements made by Zalemark's former President, Steven Zale, in the September 12, 2011 Shareholder Letter. *See* AC ¶ 27, Ex. C.

c.  Statements made in the Launch Press Release. *See* AC ¶ 28, Ex. A.

Additionally, Plaintiffs allege the following conduct by Luxury Ventures and Zalemark supports the conclusion of existence of a joint venture:

a.  Steven Zale's statements on his LinkedIn page that he is serving as the President of Zalemark while also playing a significant role in the "merchandising/marketing" of Posh TV. *See* AC ¶ 29.

b.  Zalemark's headquarters being moved to Reno, Nevada, to the headquarters of Posh TV. *See* AC ¶ 29.

4

c. "Key" persons from Zalemark having made "contract commitments to serve as part of the [Posh TV] management team." *See* AC ¶ 29.

      In reality, Posh TV was simply the name given to a TV Channel and website owned and operated by Luxury Ventures, and had no existence as a legal entity separate from Luxury Ventures. *See* Stiles Decl. ¶ 4. Zalemark is a non-managing minority shareholder of Luxury Ventures and was also hired by Luxury Ventures as an independent contractor to perform marketing services. *See Id* & Ex. C. At no time did Zalemark participate in making the substantive decisions resulting in the subject litigation. Specifically:

a. Zalemark did not participate in the decision to include references to Gems TV on Posh TV's website or in the "Remember GemsTV?" email. *See* Stiles Decl. ¶ 5

b. Zalemark did not work with a search engine optimization consultant on search engine optimization and did not participate in the decision to use JEWELRY TELEVISION or GEMSTV in connection with any "metatags" or "backlinks." *See* Stiles Decl. ¶ 6

      Furthermore, Zalemark never entered into an agreement with Posh TV or Luxury Ventures to cooperate in the business of selling jewelry and/or gemstones. *See* Declaration of Steven Zale ("Zale Decl.") ¶ 5. Zalemark did not share expenses, revenues, profits or losses with either Posh TV or Luxury Ventures. *Id.* At all times at issue, Luxury Ventures owned and operated the internet domain www.poshtv.com, and the Posh TV Channel. *Id.* Zalemark was not a manager of the Luxury Ventures limited liability company and made no managerial decisions regarding that company. *Id.* Its role was solely as specified in the aforesaid Marketing Services Agreement, to wit, Zalemark was hired as an independent contractor to perform marketing services for Luxury Ventures, "to assist company with its broadcast TV and on-line business operations by establishing relationships with jewelry designers, manufacturers and vendors and

5

other sources of product, to promote the sale of jewelry and other luxury products, to locate and acquire access to appropriate product merchandise through a variety of channels and to otherwise market the company services and products, but not limited to tie-in shows with celebrities and PR, ensuring promotions PR events, branding and network image, and merchandise sourcing from manufacturers." *Id.*

## B. The Marks

### 1. The GEMSTV Mark

Plaintiffs allege that, from 2006 until 2010, a company named GemsTV USA operated a home shopping channel focused on jewelry and gemstones and was one of Plaintiffs' primary competitors. *See* AC ¶ 38. In connection with that business, in 2005, GemsTV USA's parent company, Gems TV Holdings Limited ("Gems TV Holdings"), applied to register the mark GEMSTV for several categories of goods and services, including for both jewelry products and for television and online retail jewelry services. *See* Declaration of Todd Becker ("Becker Decl.") Ex. A (GEMSTV application).[1] The PTO repeatedly rejected Gems TV Holdings' application, including on the grounds that the mark was merely descriptive and was deceptively misdescriptive as used with television and online services, eventually allowing registration on the Supplemental Register only. *See* AC ¶ 40 & Ex. G, Becker Decl. Exs. B-C. .[2] Later, on March 24, 2009, the PTO allowed registration of the GEMSTV mark on the Principal Register,

---

[1] The application to register the GEMSTV mark and other documents filed with the PTO are subject to judicial notice. *See Mettke v. Hewlett Packard Co.*, No. 2:11-CV00410, 2012 U.S. Dist. LEXIS 49164, *7 n.2 (S.D. Ohio Apr. 6, 2012).

[2] The PTO maintains two registers for trademarks—the Principal Register and the Supplemental Register. Marks that are ineligible for registration on the Principal Register, but that are nevertheless capable of distinguishing a party's goods or services (*e.g.*, marks that are merely descriptive) may be included on the Supplemental Register. *See, e.g., George & Co. v. Imagination Entm't Ltd.*, 575 F.3d 383, 391 n.8 (4th Cir. 2009). Registration on the Principal Register confers a number of advantages, as it constitutes prima facie evidence of the mark's validity, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark. *See id.*

6

but only in connection with jewelry products—not for any TV or internet services. *See id.* ¶ 40 & Ex. F.

GemsTV USA ceased operations and filed for bankruptcy in May 2010. AC ¶ 42. In September 2010, Luxury Ventures purchased nearly all of the assets of GemsTV USA, including GemsTV USA's set and production facilities, as well as GemsTV USA's customer list. *See* Declaration of David Stiles ("Stiles Decl.") ¶¶ 2, 3 & Ex. A. Luxury Ventures also entered into agreements with many of the television hosts who had previously worked at GemsTV, as well as production staff and customer support personnel, to work for Posh TV. *See* Becker Decl. Ex. D.

Plaintiffs contend that in a separate transaction in July 2010, Gems TV Holdings assigned the rights in the GEMSTV mark (and to the URL www.gemstv.com) to MCGI. AC ¶¶ 3, 43. Plaintiffs have not alleged that they re-launched the GemsTV television network, and there is no evidence that they did.

### 2. The JEWELRY TELEVISION Mark

Plaintiff JTV alleges that it owns the rights in the registered trademark for JEWELRY TELEVISION. AC ¶ 2. The mark JEWELRY TELEVISION is registered on the Principal Register for both television and online jewelry retail services. *Id.* ¶ 60 & Ex. L.

### C. Posh TV's Alleged Uses of the Marks

Plaintiffs' Amended Complaint alleges four types of conduct in support of Plaintiffs' counterfeiting claims. First, Posh TV made references to GEMSTV on the "about us" part of its website and during television broadcasts. *See* AC ¶¶ 52-53. Second, Posh TV sent out an email advertisement with a subject line that asked the question: "Remember GemsTV?" *See id.* ¶ 50. Third, Posh TV used the term JEWELRY TELEVISION in a manner than caused Posh TV's website to appear in Internet search results for that term, and that displayed the term in the

7

accompanying description of Posh TV's website. *See id.* ¶¶ 65-70. Fourth, Posh TV twice posted links to the Posh TV website on its Facebook page, and those posts displayed the term JEWELRY TELEVISION in the description of Posh TV's website. *Id.* ¶ 71. Notably, Plaintiffs *do not* allege that Defendants used the GEMSTV or JEWELRY TELEVISION logos or mimicked the stylized appearance of those marks as they are used by Plaintiffs in the marketplace. *See* Becker Decl. Exs. E, F.

In response to interrogatories asking Plaintiffs to identify and describe in detail each activity alleged by Plaintiffs to be a use of a counterfeit mark, Plaintiffs declined to provide additional detail beyond the Amended Complaint. *See* Becker Decl. Ex. G, at 9. When Defendants pointed out that the Amended Complaint did not distinguish between facts supporting its infringement claims and those supporting its counterfeiting allegations, Plaintiffs confirmed that they contend that the same facts support both theories. Becker Decl. Exs. H-I. Thus, all of the alleged facts supporting the counterfeiting claims appear in the Amended Complaint, and are identical to the facts supporting Plaintiffs' claims for ordinary trademark infringement. *Id.*

## 1.   **PoshTV's References to GEMSTV**

Plaintiffs allege that the "about us" page of Posh TV's website - www.poshtv.com/about - used the phrase GEMSTV a number of times. *See* AC ¶ 53 & Ex. J; Becker Decl. Ex. J. Plaintiffs' Amended Complaint then selectively quotes passages of text that include the term GEMSTV from that page, claiming those passages show that Posh TV attempted to "associate itself" with the GEMSTV mark. AC ¶ 53. The context, however, illustrates that the purpose of Posh TV's "about us" page was to explain the origin of the new channel, Posh TV, and to discuss how it related to the former GemsTV television network. The top of the page prominently

displayed the Posh TV logo. *See* AC Ex. J, and Becker Decl. Ex. J. The page then immediately stated:

> In August 2010, we successfully purchased the former Gems TV broadcast studios, located in Reno, Nevada. Many of the former hosts, customer service representatives, and behind-the-scenes people of Gems TV joined our new network. We kept the very best parts of Gems TV, and took advantage of our knowledge and experience to build a brand new vision — a brand new luxury and fashion shopping experience
>
> On November 24, 2010, we launched our new venture — Posh TV. *Id.*

The remainder of the page described the features of the new venture, Posh TV. *Id.*

Plaintiffs similarly allege, on information and belief, that hosts on Posh TV "frequently referred to 'GemsTV'" on-air "in an unlawful effort to usurp the goodwill associated with the GEMSTV Marks." AC ¶ 52. Yet Plaintiffs have identified no facts showing that such references—on a TV channel clearly called "Posh TV"—could conceivably be "counterfeiting," or how the public was actually confused as to the source of Posh TV's products and services.

### 2. The "Remember GemsTV?" Email

Plaintiffs allege that on March 25, 2011, Posh TV sent out a promotional email to prospective customers with a subject line that asked if they "Remember GemsTV?". *See* AC ¶ 50 & Ex. I; Becker Decl. Ex. K. The email identified the sender of the email as "PoshTV [mailto:shop@marketing.poshtv.com]." Becker Decl. Ex. K (highlighting added by Plaintiffs). The body of the email prominently displayed the "Posh TV" logo, followed by a description of Posh TV, "a national shopping network showcasing trend-setting jewelry and accessories." *Id.* The email then described some of Posh TV's featured programs for the upcoming weekend, "brought to you by a mix of experienced hosts that you know and trust"—a reference to the fact that many of the Posh TV hosts had previously been hosts on the then-defunct GemsTV network.

9

*Id.* The body of the email mentioned "Posh TV" eight times and did not mention or use the GEMSTV mark. *Id.*

### 3. Use of JEWELRY TELEVISION in the Meta Tags for Posh TV's Website

Plaintiffs next allege that Posh TV used the term JEWELRY TELEVISION in connection with search engine optimization ("SEO") techniques employed to promote the Posh TV website. *See* AC ¶¶ 65-70. Specifically, Plaintiffs allege that Posh TV used the term JEWELRY TELEVISION in the descriptive and keyword meta tags for Posh TV's website. *Id.* ¶ 65. Plaintiffs contend that such use helped boost the search-engine rankings of Posh TV's website when users searched for the term "jewelry television." *Id.* ¶¶ 65-70.

Plaintiffs further allege that the term JEWELRY TELEVISION was displayed in the description for the Posh TV website that appeared in Internet search results. AC ¶ 69 & Ex. P; Becker Decl. Ex. L. Plaintiffs attach to the Amended Complaint a print out of search results for the term "jewelry television." The top line of the search result (which contained a link to Posh TV's website) identified the site as "Posh TV." Becker Decl. Ex. L. Below that, in a smaller font, the URL www.poshtv.com/ (also with a link to Posh TV's website) was displayed. *Id.* On the third line, also in a smaller font, appeared the following descriptive text concerning Posh TV: "Jewelry Television hottest new network Posh TV is a premier Jewelry Shopping Channel featuring Fine Jewelry, Diamond Jewelry, Moissanite Jewelry, and Gemstone Jewelry." *Id.*

### 4. Alleged Use of JEWELRY TELEVISION on Posh TV's Facebook Page

Finally, Plaintiff alleges that Posh TV twice (in May and August 2011) used the JEWELRY TELEVISION mark in posts on Posh TV's Facebook page. AC ¶ 71 & Ex. Q; Becker Decl. Ex. M. The posts in question featured a large Posh TV Logo next to text identifying "PoshTV – Home Shopping on DirecTV Channel 314" and providing a link to Posh

TV's website.  Becker Decl. Ex. M.  Below that, in a smaller font, appeared the same descriptive text mentioned above: "Jewelry Television hottest new network PoshTV is a premier Jewelry Shopping Channel featuring Fine Jewelry, Diamond Jewelry, Moissanite Jewelry, and Gemstone Jewelry." *Id.*

## II      ARGUMENT

### A. Legal Standard

Summary judgment is appropriate on a claim where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A defendant seeking summary judgment on an issue for which the plaintiff bears the burden of proof at trial may prevail by "showing that the materials cited do not establish the presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  Once the moving party has shown the absence of a genuine issue of material fact, the burden shifts to the party opposing summary judgment to come forward with admissible evidence of "specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. There was no Joint Venture Between Zalemark and Luxury Ventures

The Court of Appeals of Tennessee has stated that "[i]n order to establish a joint venture relationship between two parties, there must be a 'common purpose, some manner of agreement among them and an equal right on the part of each to control both the venture as a whole and any relevant instrumentality.'" *Dewberry v. Maddox*, 755 S.W.2d 50, 56 (Tenn. Ct. App. 1988) (quoting *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978) and citing *Spencer Kellogg & Sons, Inc. v. Lobban*, 315 S.W.2d 514 (Tenn. 1958)). In addition, the Supreme Court of Tennessee has described the following as a "very reasonable definition" of a joint venture:

11

"[A]n association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term, or a corporation, and they agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure."

*Kellogg*, 315 S.W.2d at 520 (quoting 30 Am.Jur., p. 939, Sec. 2).

In *Dewberry* (a negligent construction and breach of implied warranty case against the builders of a new home, a real estate broker, and an architect), the Court determined that there was no joint venture between the builders and the real estate company that advertised the new home. *Dewberry*, 755 S.W.2d at 52, 56. While the builders were employed as real estate agents of the real estate company, the plaintiffs did not show that the real estate company had "any control" over the construction of the house at issue in the lawsuit. *Id.*

Zalemark's role was identical to that of the real estate company in *Dewberry,* in that its sole purpose was to advertise and market the "new home" built by Luxury Ventures – Posh TV. Similarly to the real estate company in *Dewberry*, Zalemark did not have any control of the "construction" of Posh TV, and therefore, no joint venture was ever formed. Zalemark's role was limited to merely providing marketing and PR services to Luxury Ventures in connection with the Posh TV project. Accordingly, Zalemark cannot be held liable for any of the purported acts of wrongdoing.

C.   **Defendants' Uses of the GEMSTV and JEWELRY TELEVISION Marks Constituted Fair Use**

Plaintiffs' ownership of rights in JEWELRY TELEVISION does not prevent competitors from using those words to describe their own services. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (Lanham Act was not

12

"meant to deprive commercial speakers of the ordinary utility of descriptive words");
*Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 612 (6th Cir. 2009) ("Under the **fair use doctrine**, the holder of a trademark *cannot* prevent others from using the word it its *primary or descriptive* sense.") (internal quotation marks omitted).

Posh TV's descriptive uses of JEWELRY TELEVISION on Posh TV's own, clearly identified Facebook page (*see* Becker Decl. Ex. M), and the use of that term in keyword or descriptive meta tags for SEO purposes could not possibly be considered a phony version of GemsTV or its products, since the search results plainly identify Posh TV as the source of the website. *See* AC ¶ 71; Becker Decl. Ex. L. And Plaintiffs offer no evidence that Defendants imitated the font, color, design, or other aspects of the GEMSTV or JEWELRY TELEVISION marks as they appeared to ordinary consumers.

## D. Defendants' Uses of the GEMSTV and JEWELRY TELEVISION Marks did not Rise to the Level of Unfair Competition

In its most common form, the tort of unfair competition requires a showing that: (1) the defendant engaged in conduct which "passed off" its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or the authority of its organization. *Dade Int'l, Inc. v. Iverson*, 9 F. Supp. 2d 858 (M.D. Tenn. 1998).

Tenn.Code Ann. § 47–18–104(b)(3) states that "[c]ausing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another" is an unfair or deceptive act or practice." The record contains no evidence that any act or statement by Defendants misled the public about the relationship between Posh TV and GEMS TV. There

13

is no evidence that Defendants intended to deceive the public into thinking they were selling GEMS TV products and services. Finally, Plaintiffs presented no evidence – expert or otherwise – to show that the public was actually confused as to the source of Posh TV products and services.

Posh TV's alleged uses of the GEMSTV and JEWELRY TELEVISION marks all appear in contexts from which it is readily apparent that the source is Posh TV, not GEMSTV or JEWELRY TELEVISION. The "Remember GemsTV?" email, for example, was sent to recipients from "Posh TV," it included a prominent "Posh TV" logo at the top of the email, and mentioned Posh TV in the body of the email eight separate times. *See* Becker Decl. Ex. K. In context, the single question about whether recipients "Remember GemsTV?" in the subject line cannot be viewed as a fake "GemsTV" mark for Posh TV's goods or services. Indeed, any consumer receiving the email would have to go to PoshTV.com, or the Posh TV channel, to make a purchase, and the Posh TV mark appeared prominently on both.

E. **Defendants' Uses of the GEMSTV and JEWELRY TELEVISION Marks did not Constitute Counterfeiting**

1.  *A "Counterfeit" Mark Must Be Both Spurious and Substantially Indistinguishable from the Plaintiff's Registered Mark.*

"Counterfeiting is the act of producing or selling a product with a *sham trademark* that is an *intentional and calculated reproduction* of the genuine trademark." 4 McCarthy on Trademarks ("McCarthy") § 25.10 (emph. added). A counterfeiting claim requires a showing that is both distinct from, and in addition to, the conduct required to show ordinary infringement. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) ( "counterfeiting is the 'hard core' or 'first degree' of trademark infringement that seeks to trick the consumer into believing he or she is getting some genuine article") (quoting McCarthy § 25.10). While proof

14

of infringement is necessary to establish counterfeiting, it is not sufficient. *See Schneider Saddlery Co. v. Best Shot Pet Prods. Int'l, LLC*, No. 1:06-CV-02602, 2009 WL 864072, *4 (N.D. Ohio Mar. 31, 2009) ("Infringement . . . is merely one prerequisite to a finding of a counterfeit mark.").

For purposes of treble or statutory damage awards under 15 U.S.C. § 1117, the Lanham Act defines "counterfeit mark," in pertinent part, as "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." 15 U.S.C. § 1116(d)(1)(B). 15 U.S.C. § 1127, in turn, defines the term "counterfeit" as "a *spurious* mark which is identical with, or substantially indistinguishable from, a registered mark." (emph. added). Thus, it is not enough for the plaintiff to simply show that a defendant used a mark that is "identical with, or substantially indistinguishable from" the plaintiff's registered mark; the plaintiff must also prove that the accused mark is "spurious." *Id.*; *see, e.g., GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 472 (S.D.N.Y. 2011) (granting summary judgment for defendant, noting statutory "requirement that a counterfeit mark be a 'spurious' mark"); *Ross Cosmetics Distrib. Ctrs., Inc. v. United States*, 18 C.I.T. 979, 985-86 (C.I.T. 1994) (mere use of identical mark cannot establish counterfeiting, as it would "ignore the distinction between counterfeit and mere infringement"). Whether a particular use of a mark is a "counterfeit" use is a question of law resolvable on summary judgment. *See Timber Prods. Inspection v. Coastal Container Corp.*, 827 F. Supp. 2d 819, 827 n.2 (W.D. Mich. 2011).

Spurious is a synonym for "counterfeit," as that term is used in ordinary parlance - a deceptive fake. The Lanham Act does not define "spurious," but courts have looked to the

15

definitions of "spurious" in Black's Law Dictionary and other dictionaries to confirm its ordinary meaning for purposes of trademark counterfeiting. *See GMA Accessories*, 765 F. Supp. 2d at 472; *United States v. Chong Lam*, 677 F.3d 190, 202 (4th Cir. 2012) (interpreting 18 U.S.C. § 2320(a), criminal counterfeiting statute);[3] *U.S. v. Turnbull*, No. 3:13cr37, 2013 U.S. Dist. LEXIS 178584, *19 (M.D. Pa. Dec. 20, 2013) (same).

The first entry for "spurious" in Black's is directly applicable: "Deceptively suggesting an erroneous origin; fake <spurious trademarks>." Black's Law Dictionary 1533 (9th ed. 2009). Merriam-Webster's includes two similarly apt definitions: "outwardly similar or corresponding to something without having its genuine qualities : FALSE," and "of falsified or erroneously attributed origin : FORGED." Merriam-Webster's Collegiate Dictionary 1210 (11th ed. 2012); www.merriam-webster.com/dictionary/spurious. Pursuant to those definitions, in the context of a counterfeiting claim, a mark is not "spurious" if it merely creates confusion as to association or origin, but only if it deceptively claims a false source for goods or services. *See U.S. v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir. 1997).

In addition, to determine whether an accused mark is "identical with, or substantially indistinguishable from" the plaintiff's mark, a court must consider the uses of the marks in context, as the marks would appear to an ordinary consumer. *See Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007); *GTFM, Inc. v. Solid Clothing, Inc.*, No. 01-Civ.-2629, 2002 U.S. Dist. LEXIS 15422, *6-7 (S.D.N.Y. Aug. 21, 2002).

---

[3] Although there are slight textual differences between the criminal and civil definitions of counterfeit marks, both contain the requirement that the accused mark be "spurious," and the criminal definition was intended to be coextensive with the civil definition. *See* 18 U.S.C. § 2320(f)(1) (defining "counterfeit mark" to require, *inter alia*, "a spurious mark . . . that is identical with, or substantially indistinguishable from" a registered mark); McCarthy § 25.15 ("While there are slight differences in the civil and criminal definitions of 'counterfeit,' they are 'identical in substance.'") (quoting Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12078 (Oct. 10, 1984)).

Even minimal differences, if apparent to a consumer, are therefore sufficient to defeat a counterfeiting claim. *Schneider Saddlery Co.*, 2009 WL 864072 at *4-5.

Accordingly, a "counterfeit mark," for purposes of 15 U.S.C. § 1117, is one that (1) is used to deceptively indicate a false source for goods or services; ***and*** (2) is identical to or substantially indistinguishable from a registered mark, as it would appear to an ordinary consumer. *See Chong Lam*, 677 F.3d at 202; *Turnbull*, 2013 U.S. Dist. LEXIS 178584 at *19.

**2.** *Plaintiffs Do Not Allege Any "Counterfeit" Use of the GEMSTV or JEWELRY TELEVISION Marks.*

Under these standards, Plaintiffs' counterfeiting claims fail as a matter of law, as they have not identified any use of a "spurious" mark, or a use that is "identical with, or substantially indistinguishable from" Plaintiffs' marks, as the marks would appear to an ordinary consumer. Viewed in the light most favorable to Plaintiffs, none of the accused uses of the GEMSTV or JEWELRY TELEVISION marks falsely or deceptively conveys the source of any goods or services.

At bottom, none of Plaintiffs' allegations even suggests an attempt to use Plaintiffs' marks to brand Posh TV's goods or services as Plaintiffs'. Courts have repeatedly rejected trademark counterfeiting claims in similar cases where the facts simply did not show the use of a mark to pass-off the defendant's goods as having come from the plaintiff. In *Ross*, for example, the court held that a party's references to the protected marks "GIORGIO" and "L'AIR DU TEMPS" on the packaging of its lower-cost perfume products "GORGEOUS" and "LOVE BIRDS" did not amount to counterfeiting, *even though the identical marks were used*, because the context showed there was no attempt to misidentify the products' source. 18 C.I.T. at 985.[4]

---

[4] *See also Pebble Beach Co. v. Tour 18 Ltd.*, 155 F.3d 526, 554 n.2 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001) (rejecting claim for counterfeiting damages in suit

The *Ross* court then went on to emphasize the distinction between counterfeiting and ordinary infringement in such circumstances: "If a likelihood of confusion exists, plaintiff's use of the marks would constitute trademark infringement, but not a counterfeit use of the marks." *Ross*, 18 C.I.T. at 986.

As in *Ross*, Defendants' alleged uses of the accused marks are categorically distinct from "counterfeit" uses, as all of Defendants' uses were in a context that clearly identified the true source: Posh TV. *See Ross*, 18 C.I.T. at 985.[5] Plaintiffs allege that Defendants used the GEMSTV mark to "associate" Posh TV with GEMSTV, not to trick consumers into thinking that Posh TV *was* GEMSTV, or to sell knock-off, GEMSTV-branded jewelry. Similarly, Plaintiffs' allegations that Defendants wrongly used the phrase JEWELRY TELEVISION in connection with their SEO strategies to promote Posh TV are, at most, allegations of ordinary infringement involving initial interest confusion.[6]

Tellingly, no case has ever found that the use of a competitor's mark in Internet advertising keywords or meta tags is a "counterfeit" use of the mark—indeed, Defendants have been unable to find a case where the plaintiff even *claimed* that such use constituted

---

against golf course comprising holes copied from famous courses; although defendant found to have intentionally copied plaintiffs' trademarks and trade dress, court ruled that "this is simply not a counterfeiting case").

[5] In addition, Plaintiffs also cannot establish that Defendants used a mark "identical with, or substantially indistinguishable from" Plaintiffs' GEMSTV and JEWELRY TELEVISION marks. As actually used in commerce, both of those marks appear in a particular, stylized fashion. *See* Becker Decl. Exs. E (GEMSTV), F (JEWELRY TELEVISION). Plaintiffs have not, however, alleged that Defendants mimicked the appearance of those marks, and the only uses of the marks identified in the Amended Complaint involved the use of the terms GEMSTV and JEWELRY TELEVISION in plain, undifferentiated text. Under those circumstances, no reasonable consumer viewing the marks in context could conclude that the marks were "substantially indistinguishable." *See GTFM, Inc.*, 2002 U.S. Dist. LEXIS 15422 at *6-7 (no counterfeiting where defendant's use of the number "05" not substantially indistinguishable from plaintiff's use of number "05").

[6] Under the theory of initial interest confusion, a court may find trademark infringement where "a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 549 (6th Cir. 2005). The Sixth Circuit has **rejected** the notion that a likelihood of confusion analysis (the test for ordinary infringement) can rest on initial interest confusion alone (*Id.* at 549-50) and has certainly never found that initial interest confusion can form the basis of a counterfeiting claim.

counterfeiting. The reason is obvious: meta tag and sponsored-ad keyword cases involve competitive efforts to promote and advance a party's own product and mark by attracting the attention of consumers who might be interested in a competitor's product or service; they manifestly do not involve an attempt to convince consumers that the defendant's product or service is actually offered by the plaintiff. *See Schneider Saddlery Co.*, 2009 WL 864072 at *15.

If the alleged uses of Plaintiffs' marks identified in this case could give rise to an actionable counterfeiting claim, then *every* trademark infringement case involving the use of keywords, meta tags, or SEO tools on the Internet would become a counterfeiting case. But no court has ever equated those uses with counterfeiting, and doing so would simply encourage plaintiffs to add counterfeiting allegations to every trademark case as a matter of routine. This is a result that Congress sought to avoid,[7] and that this Court should not countenance.

**3.**   *Plaintiffs' Counterfeiting Claim for GEMSTV Also Fails Because the GEMSTV Mark Is Not Registered on the Principal Register for Online or Television-Related Retail Services.*

As noted above, the owner of a registered mark may seek treble or statutory damages for a defendant's use of a "counterfeit mark" only if the plaintiff's mark is "registered on the principal register in the United States Patent and Trademark Office" for the same goods or services for which the accused mark was used. 15 U.S.C. §§ 1116(d), 1117(b)(1); *Playboy Enters., Inc. v. Universal Tel–A–Talk, Inc.*, No. CIV. A. 96-CV-6961, 1998 WL 288423, *4 (E.D. Pa. June 3, 1998).

---

[7] *See* Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12083 (Oct. 10, 1984) (Becker Decl. Ex. N) ("The sponsors wish to discourage frivolous allegations of counterfeiting in trademark infringement suits, and to prevent a demand for 'counterfeiting treble damages' from becoming a 'boilerplate' request in ordinary trademark infringement suits."). Indeed, the legislative history indicates that, to prevent frivolous counterfeiting claims, Congress intended to permit courts to award attorneys' fees to prevailing defendants in such cases. *Id.*

19

In this case, the GEMSTV mark is registered on the Principal Register, but only in connection with particular items of jewelry in Class 14. *See* AC ¶ 40 & Ex. F. None of the alleged "counterfeit" uses of the GEMSTV mark, however, appears on any jewelry product or packaging. Rather, every use of the GEMSTV mark identified by Plaintiffs appears either in an email promoting the television station, Posh TV, or on the "about us" page of its affiliated website. This is particularly significant here, where GemsTV originally attempted to register the mark for TV and Internet services, and the PTO rejected the application because GEMSTV is descriptive of such services. *See* Becker Decl. Exs. B-C. The PTO's decision thus forecloses any counterfeiting claim concerning the use of the GEMSTV mark in connection with television or online retail services.

Because none of the accused uses of the GEMSTV mark involves use of the mark for jewelry products, and because the PTO expressly refused to allow registration on the Principal Register for television and online services, Plaintiffs cannot seek statutory or treble damages based on any supposed "counterfeit" use of the GEMSTV mark in this case. *See, e.g.*, *Timber Prods. Inspection*, 827 F. Supp. 2d at 828-30 (plaintiff not entitled to seek statutory damages for counterfeit use of mark registered for "testing and grading of building materials" where defendant used mark on corrugated cardboard boxes); *Ford Motor Co. v. O.E. Wheel Distribs., LLC*, 868 F. Supp. 2d 1350, 1371 (M.D. Fla. 2012) (dismissing claim for use of counterfeit mark on automotive wheels and center caps where mark was registered only for "auto parts and accessories, namely, interior insignia badges"; "As wheels and center caps were not named, they were not covered by the registration. As a result, Ford cannot prevail on its counterfeiting claim . . . ."); *Coach, Inc. v. Asia Pacific Trading Co.*, 676 F. Supp. 2d 914, 923-24 & n.4 (C.D. Cal.

20

2009) (plaintiff not entitled to recover statutory damages for claimed counterfeit use of mark on sunglasses where mark registered on Principal Register for sunglass cases, but not sunglasses).

For all of the reasons stated above, there was no unlawful use of any counterfeit mark by Defendant Zalemark Holding Company, Inc.

### F. **Defendants did not Infringe upon the GEMSTV and JEWELRY TELEVISION Marks**

To establish a claim of trademark infringement or unfair competition, a party must show ownership of a valid trademark and that the use of the allegedly infringing mark is likely to cause confusion. *E.g., Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,* 174 F.3d 1036, 1046-47 (9th Cir. 1999). In order for customer confusion to be likely, it is imperative that Plaintiff and Defendant actually compete in the marketplace, and both Plaintiff's and Defendant's names are somehow publicly associated or affiliated with the marks at issue. In *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, the 9th Circuit Court stated that in evaluating likelihood of confusion, courts examine the proximity of the marketing channels to one another and whether direct competition exists. *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 606 (9th Cir. Cal. 1987). There was never any direct competition in this case. GemsTV USA ceased operations and filed for bankruptcy in May 2010. AC ¶ 42. Plaintiffs have not alleged that they re-launched the GemsTV television network, and there is no evidence that they did. Where Plaintiff's mark is completely absent from the marketplace, by definition no confusion is possible or likely.

The Sixth Circuit's decision in *Interactive Products Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687 (6th Cir. 2003) is also instructive here. *Interactive Products* involved two former business partners who produced a car-mounted computer stand called the "Lap Traveler." *Id.* at 692. When they parted ways, plaintiff obtained the exclusive right to use

the "Lap Traveler" mark. But the defendant (who named his competing product the "Mobile Desk") used the "Lap Traveler" mark in the post-domain URL for the web page used to sell the Mobile Desk, and defendant's website repeatedly used the "Lap Traveler" mark in describing the history behind its competing product. *Id.* at 693 (quoting defendant's "Important Announcement about the Lap Traveler Product"). Likely as a result of these practices, defendant's website consistently appeared in Internet searches for Plaintiff's mark. *Id.* Nevertheless, the Sixth Circuit affirmed summary judgment dismissing the plaintiff's trademark infringement claim, ruling that there was no question of material fact as to whether a consumer would be confused about the source of the defendant's product or the website, particularly because the defendant's product was "clearly and prominently" marked as "The Mobile Desk." *Id.* at 696-97.[8]

As in *Interactive Products*, Posh TV made historical references to the GEMSTV mark, but "Posh TV" was clearly and prominently identified as the source of the services it promoted. And the use of JEWELRY TELEVISION in search engine optimization efforts, like the use in the post domain URL in *Interactive Products*, did not identify the *source* of Posh TV's offerings.

## G. Defendants were not Unjustly Enriched Through their use of the GEMSTV and JEWELRY TELEVISION Marks

Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist. *Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn.1998) (citing Paschall's, Inc. v. Dozier,

---

[8] *See also Gen. Steel Domestic Sales, LLC v. Chumley*, No. 10-cv-013980-PAB-KLM, 2013 WL 1900562, *7-11 (D. Colo. May 7, 2013) (finding that competitor's extensive use of plaintiff's registered mark "general steel" in sponsored Google ads and in website copy intended to boost competitor's web search optimization were unlikely to result in consumer confusion; finding for defendant on plaintiff's trademark claims).

219 Tenn. 45, 407 S.W.2d 150, 154–55 (1966)). Such contracts are not based upon the intention of the parties but are obligations created by law and are "founded on the principle that a party receiving a benefit desired by him, under the circumstances rendering it inequitable to retain it without making compensation, must do so." *Paschall's*, 407 S.W.2d at 154. A contractual obligation under an unjust enrichment theory will be imposed when: (1) no contract exists between the parties or, if one exist, it has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation. *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 217 (Tenn. Ct. App. 2004)

The elements of an unjust enrichment claim are: 1) "[a] benefit conferred upon the defendant by the plaintiff"; 2) "appreciation by the defendant of such benefit"; and 3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. *" Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 407 S.W.2d 150, 154–55 (1966))

After just over a year of unsuccessfully trying to get Posh TV off the ground, Luxury Ventures filed for bankruptcy in November of 2011. Furthermore, Plaintiffs have not presented any evidence of the profits or revenues generated by any of the Defendants in connection with their use of the allegedly infringing marks either in their Amended Complaint or in the discovery responses. Therefore, there was no benefit conferred upon or retained by Defendants in connection with their use of the marks, and Plaintiff's claim for unjust enrichment fails for that reason.

23

## III.   CONCLUSION

In support of its Motions, Defendant Zalemark has demonstrated that there is no genuine issue of material fact concerning whether: 1) Zalemark was liable as a joint venturer for the acts of wrongdoing recounted in the Amended Complaint; 2) Defendants engaged in fair use of the marks; 3) Defendants engaged in unfair competition through their use of the disputed marks; 4) there was use of a counterfeit mark for purposes of 15 U.S.C. Sections 1114, 1116 and 1117; 5) Defendants use of the marks constituted trademark infringement; and 6) Defendants were unjustly enriched through their use of the marks. Defendant Zalemark respectfully submits that it is entitled to summary judgment on all counts, or, in the alternative, to summary adjudication on Counts I, II, IV and VI of the Amended Complaint.

Dated:   September 26, 2014        Respectfully submitted,

_/s/Todd B. Becker_____
TODD B. BECKER (admitted *pro hac vice*)
becker@beckerlawgroup.com
BECKER LAW GROUP
3750 E. Anaheim Street, Suite 100
Long Beach, CA 90804
Telephone:    (562) 495-1500
Facsimile:    (562) 494-8904

*Attorneys for Defendant*
Zalemark Holding Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Todd B. Becker*
Todd B. Becker

TODD B. BECKER (admitted *pro hac vice*)
becker@beckerlawgroup.com
BECKER LAW GROUP
3750 E. Anaheim Street, Suite 100
Long Beach, CA 90804
Telephone:  (562) 495-1500
Facsimile:  (562) 494-8904

*Attorneys for Defendant*
Zalemark Holding Company, Inc.